## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| RADNOR HOLDINGS | ) | Case No. 06-10894 PJW |
| CORPORATION, *et al.*, | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |
| | ) | |
| THE OFFICIAL COMMITTEE OF | ) | |
| UNSECURED CREDITORS OF | ) | |
| RADNOR HOLDINGS | ) | |
| CORPORATION, *et al.*, | ) | Adversary Proceeding No. 06-50909 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TENNENBAUM CAPITAL | ) | |
| PARTNERS, LLC; SPECIAL | ) | |
| VALUE EXPANSION FUND, LLC; | ) | |
| SPECIAL VALUE OPPORTUNITIES | ) | |
| FUND, LLC; AND JOSÉ E. | ) | |
| FELICIANO, | ) | |
| Defendants. | ) | |
| | ) | |

## AMENDED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

On August 21, 2006 (the "Petition Date"), Radnor Holding Corp. and its affiliated

chapter 11 debtors ("Debtors" or "Radnor") commenced the above-captioned chapter 11

cases. On September 22, 2006, the Court entered its "Final Order (I) Authorizing

Debtors (A) to Obtain Postpetition Financing . . ." (the "DIP Financing Order"). Also on

Sept. 22, 2006, the Court entered its "Order . . . (I) Establishing Bid Procedures Relating

---

[1] This amendment reflects (a) non-substantive changes and (b) fact finding
additions to Doc. # 37. The judgment remains the same.

to Sale of Debtors' Assets . . ." (the "Bid Procedures Order"). On October 30, 2006, the Court entered its "Order Granting Official Committee . . . Standing" (the "Standing Order").

Pursuant to the DIP Financing Order and the Standing Order, the Court authorized the Official Committee of Unsecured Creditors ("Plaintiff" or the "Committee") to file a Complaint against Tennenbaum Capital Partners, LLC, Special Value Opportunities Fund, LLC, Special Value Expansion Fund, LLC (collectively, "Tennenbaum" or "TCP"), and José E. Feliciano (collectively with TCP, "Defendants"). Pursuant to the Bid Procedures Order (at ¶ 8), the Court ordered that the trial on the merits of the Complaint would include a determination on the allowance of the $128.8 million proof of claim filed by the Defendants. Also pursuant to the Bid Procedures Order (at ¶ 9), the Court ordered that the Defendants would be authorized to credit bid any allowed claim that survived adjudication of the Complaint.

On October 31, 20006, Plaintiffs filed the Complaint. By the time that trial commenced, the parties had engaged in nearly two months of extensive pre-trial discovery. The Court conducted eight full days of trial between November 2 and November 14, 2006, heard testimony from fourteen witnesses and admitted more than 350 documents into evidence. Based upon evidence presented at trial, the Court hereby makes the following Findings of Facts and Conclusions of Law. Based upon these Findings of Fact and Conclusions of Law, and in accordance with the requirements of Federal Rule of Bankruptcy Procedure 9021, the Court has separately entered judgment in favor of Defendants on all counts, allowing Defendants' claim in the amount of $128,835,557.26, and authorizing the holder of such allowed claim to credit bid the allowed claim at any

sale of property of the Debtors that is subject to a lien securing such allowed claim.

The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

The Court has jurisdiction to hear and determine the causes of action and requests for relief contained in the Complaint pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(b). Venue of the adversary proceeding in this district is proper under 28 U.S.C. §§ 1408 and 1409. Defendants have consented to the entry of final orders and judgments by this Court on all non-core proceedings pursuant to Fed. R. Bankr. Proc. 7012(b).

## FINDINGS OF FACT

1.      In the late summer of 2005, Tennenbaum partner Jose Feliciano learned from his partner Steven Chang that Radnor was looking for financing through its placement agent, Lehman Brothers. (Tr. 17:9-15; 18:3-6).

2.      Lehman Brothers advised Radnor that a transaction to raise a combination of debt and equity capital was in Radnor's best interests.  Radnor was seeking approximately $50 million in new debt and equity capital ($30 million of senior secured debt plus $20 million of convertible preferred stock) to fund an expansion of its growing polypropylene cup business and related working capital.  (Tr. 351:3-7; 736:1-4; 876:14-24; 877:1-22; 950:3-12; 953:1-23).  Radnor also contemplated a later IPO.  According to Michael Kennedy,  Radnor's CEO and majority shareholder,  in a June 2005 e-mail to a Radnor board member and Radnor's in-house counsel, "we plan to follow this capital

3

raise with the IPO, but if delayed to 2006 for any reason we should have plenty of liquidity." (JX  23).  TCP was fully aware of Radnor's IPO intent prior to its first transaction in October, 2005.  (JX 40).  The Lehman plan to have an infusion of $30 million of debt and $20 million of equity contemplated that the $30 million of debt would be secured by collateral which was already the subject to a lien by a $70 million lender. The $30 million new senior secured debt would be secured pari passu with the existing $70 million obligation.  However, Radnor would have to obtain the consent of the $70 million lender for the sharing of such collateral.

3.    Lehman Brothers canvassed the market through a Private Placement Memorandum and contacted 40 potential investors.  (Tr. 17:9-24; 33:6-34:22; 232:19-233:22; 1165:15-1166:6; JX 311).  Lehman determined that the best strategy was a part debt, part equity transaction.  (Tr. 1211:2-24).

4.    Mr. Finigan, a member of the Board of Directors of Radnor, testified that management considered a range of options (Tr. 1175:1-22), and believed that liquidation would have provided less value than operating the Company.  (Tr. 1176:2-15; *cf.* Tr. 707:6-22).

5.    TCP was chosen among the 40 entities solicited by Lehman because it was willing to move the most quickly.  (Tr. 1756:19-1757:5).

6.    The Company's projections showed that it expected to earn $48 million in EBITDA in 2005 and $81 million in EBITDA in 2006.  (Tr. 21:24-22:3; 23:20-23; JX 311).    Mr. Feliciano believed that an investment in Radnor was worth further consideration due in part to its potential for sustained growth.  (Tr. 200:17-20).

4

7.      Throughout the late summer and early fall of 2005, TCP engaged in extensive financial, business and legal due diligence. (Tr. 320:7-23; 523:12-524:20; 834-35; 838:16-839:8; 842:22-843:11; 987:8-988:17). Among other things, it met with Radnor personnel, customers and suppliers to gain a better understanding of the nature of Radnor's businesses and visited Radnor's operating facilities. TCP also assessed the Company's historical performance to help evaluate whether the Company's optimistic forecasts were justified. In mid-September 2005, TCP retained FTI Consulting, Inc. ("FTI") to perform accounting due diligence of Radnor's historical financial data. (Tr. 990:11-19; 991:2-10; 1088:6-1090:16; JX 58). FTI submitted to TCP its Financial and Accounting Due Diligence Report on October 10, 2005. (JX 58).

8.      Tennenbaum had no reason to doubt the financial information that was provided by Radnor management. (Tr. 1092:11-24). Indeed, while the FTI report disagreed with certain accounting adjustments made by Radnor, the types of accounting adjustments reflected in the FTI report were not in any way unusual or extraordinary. (Tr. 1091:6-13; 1091:23-1092:10).

9.      Radnor exceeded forecasts in 2001 and met forecasts in 2002. As of October 27, 2005, the only full years it had missed forecasts were 2003 and 2004, the very year the company acquired Polar Plastics, a new line of business for the company, and the next year. Moreover, the Court credits the testimony of Mr. Palm of Lehman Brothers that as of October 2005, the Company's projections were well thought out "bottoms up" projections and that each assumption was supportable, even if in the aggregate the projections were optimistic. (Tr. 1748:9-1749:1).

10.     In early October 2005, Mr. Feliciano and his colleagues provided to the

5

TCP's Investment Committee a detailed update on TCP's due diligence efforts and gave the Investment Committee the opportunity to consider both the benefits and the risks of making an investment in Radnor. (Tr. 60:21-61:7; 197:18-24; JX 55). Mr. Feliciano also presented to the Investment Committee TCP's internal projections for 2006 EBITDA. Although Mr. Feliciano was hopeful that Radnor would reach its projection of $81 million in 2006 EBITDA, he prepared conservative internal projections that considered a "downside" scenario (of $61 million EBITDA) should the Company not perform as expected. (Tr. 61:12-18; 198:4-21). The preparation of conservative downside projections is customary for TCP and for many other investment firms. It does not indicate that TCP expected EBITDA to be at that level. (Tr. 55:22-56:15).

11.     On October 27, 2005, TCP made its initial investment in Radnor through a commitment to purchase $25 million of Series A Preferred Stock (the "Preferred Stock") and to lend $95 million in senior secured debt to the Company (the "Tranche A and Tranche B Loans") (Tr. 234:14-235:4). The Tranche A and Tranche B Loans closed on December 1, 2005. (JX 91, 93). They were funded at 99.25% of par. (Tr. 92:22-93:2). The Preferred Stock included detachable warrants that would give TCP the right to own certain levels of Radnor common stock (not to exceed 15.625%), depending on the Company's actual EBITDA performance. (Tr. 496:1-24).

12.     As noted above, Radnor believed that it would be able to obtain consents from its existing senior secured noteholders in connection with the new $30 million secured obligation. That turned out to be wrong. Thus, Radnor used the $95 million Tranche A and B loans proceeds to redeem all of the $70 million of senior secured notes. (Tr. 83:17-85:17). In addition, the TCP loan proceeds were used to pay down $4.7

million of equipment loans, pay down Radnor's revolving credit facility and fund working capital and growth initiatives. (Tr. 5-26; 67:1-21; 269:4-21; 397:7-398:15; 402:5-16; JX 91).

13.     On October 27, 2005, TCP entered into an Investor Rights Agreement with Radnor's shareholders. (JX 78). The Investor Rights Agreement gave TCP several rights that are often given by an issuer to protect the interests of minority shareholders including the right to designate one member and one observer to the board, the right to increase its representation on the board if the Debtors failed to achieve certain EBITDA levels, and the right to veto certain employment agreements and transactions with affiliates. (*Id.*; Tr. 502:5-9; 1356:23-1358:16). TCP never exercised any of those rights (Tr. 502:5-9, 502:23-503:9) other than the right to designate one member and one observer to Radnor's Board of Directors. (JX 78 §§ 3.1, 3.2.). Mr. Kennedy retained the right to appoint the remaining three directors. TCP designated Mr. Feliciano and Mr. Mehrotra as the representative Board member and observer, respectively. (Tr. 120:22-121:2). Mr. Feliciano testified that the provisions set forth in the Investor Rights Agreement are "fairly typical" for such an equity investment. (Tr. 205:17-206:19). My experience fully supports that view. The Investor Rights Agreement reflects a reasonable and appropriate mechanism for protection of a minority equity interest. The Committee offered no expert testimony on practices relating to lender or investor protection provisions.

14.     Mr. Feliciano testified that TCP did not plan to acquire the Debtors at the time that TCP made the initial investment in the Debtors, nor at any time thereafter. (Tr. 47:16-22).     There is no reliable evidence to the contrary.     None of the internal

7

memoranda prepared by TCP when the first investment was made show that TCP had any intention of buying Radnor. (Tr. 243:23-244:22; JX 40, 66). The TCP memoranda prepared when the initial investment was made showed that TCP believed that even the liquidation preference of the Preferred Stock would be paid in a downside scenario, and that Radnor would comply with the $55m EBITDA covenant for 2006. (JX 55). The belief that the company could meet its EBITDA targets was shared by those on the Radnor board. (Tr. 1748:9-1749:1).

15.    TCP received representations from the Company that it was solvent, including a solvency certificate from the CEO and CFO (Mr. Ridder) of Radnor at the time of the Tranche A and B loans. (Tr. 112:2-23; JX 91 at p. 14 § (ii), p. 55 § (l)). I find that it would be irrational to believe that TCP would have made a $25 million equity investment if it believed Radnor were insolvent at the time. Tennenbaum's infusion of $25 million in the form of preferred stock (with warrants and conversion rights) is a clear indication that Tennenbaum believed that there was an upside to its investment. If, as the Committee argues, Tennenbaum's scheme was a "loan to own," why would it make an equity investment in addition to the debt transaction? The logical alternative would be to make a debt investment only so that Tennenbaum would have a better position in the event of a meltdown, i.e., a liquidation.

16.    TCP understood in October 2005 that the Company was seeking a capital infusion to fund new product initiatives that were already in place. The Company had already executed agreements regarding new products, like its polypropylene cup line, at the time. (Tr. 39:7-12; 316:3-21; JX 81; 351:3-7; 516:19-517:1; 876:14-878:13; 949:14-954:9; 1048:16-1049:2; JX 58).

17.    The Radnor board of directors believed that the capital infusion sought in June 2005, and occurring in October 2005, was in the best interests of the Company and would be favorable to its capital structure (Tr. 397:21-398:15; 936:16-937:12; 1163:12-1164:17; 1169:13-24). The Board similarly believed that the Tranche A and Tranche B transactions were in the best interests of the Company by providing liquidity to fund new business initiatives and paying down existing debt. (Tr. 1167:10-1169:24).

18.    At all times, Radnor and Tennenbaum treated the Tranche A and B loans as debt investments.  (Tr. 239:11-240:10, 577:3-578:11).  All internal memoranda from TCP show that the Tranche A and B loans were referred to as debt.  (JX 40, 66).  The documents themselves contain typical terms and conditions of a secured debt instrument: the Tranche A and B loans provide fixed maturity dates; fixed interest payments; default provisions and common maintenance and incurrence covenants.  (JX 91, p. 19, 20, 50; JX 171, § 1.9).

19.    All internal memoranda from TCP both at the time of the Tranche A and B transactions and thereafter demonstrate that TCP's estimate of the "downside" scenario show that the debt and the liquidation preference of the preferred stock investment would be paid by the enterprise value of the Company.  (JX 55; Tr. 60:20-64:5).

20.    The collateral package for the loans under Tranche A and B included substantially all property, plant, and equipment of the Debtors, including real estate.  (Tr. 18:20-19:12; JX 54; 71 Annex 1).  Tennenbaum undertook a reasonable process to ascertain the value of its collateral package for the Tranche A and B loans.  (Tr. 321:9-322:16; 834:4-835:4).  Radnor provided Tennenbaum with appraisals that indicated the collateral available as security for the loans was equal to or greater in value than the

9

outstanding amounts of the Tranche A and B loans at the times they were issued. (Tr. 227:12-228:12; 1683:7-10; JX 54, 242).

21.    Radnor's capitalization in October 2005 was not clearly insufficient to support a business the size and nature of Radnor's in light of the circumstances at the time the Tennenbaum loans were made. (Tr. 39:4-40:20, 898:9-899:2). At the time of the Tranche A and B loans, Radnor may have been able to borrow a similar amount from another lender, based on the number of interested investors identified by Lehman. (Tr. 33:6-23, 1165:15-1166:6).    Mr. Kennedy testified that in Lehman's efforts in August/September 2005 it had contacted numerous potential investors and between 20 and 25 such potential investors signed confidentiality agreements to obtain more information from Radnor. (Tr. 355:23-356:10). This fact certainly suggests that there were a number of potential investors who, after reviewing the Lehman's August 2005 memorandum, did not believe it was not worth considering the proposed debt and equity investment.

22.    The Debtors' creditors were not harmed by the Tranche A and B loans and preferred stock investment, but rather benefited from them. The Tranche A and B loans and preferred stock investment by TCP, in the aggregate, decreased Radnor's net debt. (Tr. 104:15-105:5; 241; 534; 939-40; 1674:3-1675:9).

23.    In early 2006, TCP received preliminary indications from Radnor management that the fourth quarter 2005 earnings would be below expectations. (Tr. 512:23-513:11). Mr. Feliciano received the Debtors' actual fourth quarter and year-end results at a Radnor Board meeting held on February 9, 2006. (Tr. 123:10-124:1; JX 117). The numbers were dismal, and defied even the most conservative EBITDA estimates that

had been given to TCP by the Debtors in January: $20 million of negative EBITDA in 2005, in contrast to the projection of $48 million of EBITDA that Radnor had used to induce the TCP Lenders to make their investment in Radnor. (Tr. 594:3-9; 23:15-23).

24.    Upon receiving Radnor's fourth quarter results, TCP performed further investigations over the following weeks to get a better understanding of the reasons behind the losses and the nature and extent of the issues facing the Debtors in 2006. (Tr. 1062:13-21; 1065:16-1066:20; JX 133). The Debtors' bank lenders took similar steps, engaging Brandlin & Associates, a forensic accounting firm, to monitor the Debtors. (Tr. 560:3-24; 501:1-4). As part of its investigations, and to better monitor the Debtors' performance, TCP requested that management provide TCP with more detailed and timely financial information. (Tr. 127:16-128:20). In addition to meetings with Radnor personnel, TCP requested that the Company provide it with Daily Performance Reports and borrowing base certificates on a regular basis. (Tr. 127:23-128:10; 132:23-133:4). As part of TCP's investigation in the first quarter of 2006, a group of TCP representatives traveled to Radnor, Pennsylvania in March. (Tr. 1061:20-1062:21; 1081:12-24; 1256:10-20). During this same period, in the interest of protecting the bank lenders, Brandlin & Associates was reviewing Radnor's forecasts (inside information). (JX 223).

25.    Mr. Feliciano provided updates to the Investment Committee on or about February 9, 2006, February 14, 2006 and March 10, 2006, summarizing the team's efforts as they gathered more information about the Debtors' performance. (JX 117, 125, 133). Mr. Feliciano reported that the Debtors blamed the downturn in the fourth quarter on several factors, including higher than expected raw material costs, delays in expected price increases, and a more severe negative impact from the Gulf Coast hurricanes than

11

the Debtors or TCP had ever expected. (JX 133 at 1). Mr. Feliciano remained cautiously optimistic about the Debtors' business prospects based on the anticipated roll-out of new products and advised the Investment Committee that he would continue to refine expectations for the Debtors' 2006 earnings. (JX 133 at 9).

26.     As a result of the devastating decline in earnings in the fourth quarter of 2005 and the first quarter of 2006, the Debtors faced cash flow and liquidity problems and requested an additional advance from TCP to bridge the liquidity gap. (Tr. 529:9-530:20). Given the amount of capital TCP had invested in the Debtors, Mr. Feliciano and TCP were understandably concerned about the Debtors' liquidity issues and performed more diligence, with the assistance of TCP's Mr. Mehrotra and Mr. Berry, to evaluate the Debtors' needs and to update the Investment Committee. (Tr. 1062:13-21; 1065:16-1066:10; JX 133).

27.     The unsecured noteholders received a $7.4 million interest payment on March 15, 2006. (Tr. 555:24-556:22).

28.     In a memo to the Investment Committee dated March 28, 2006, Mr. Feliciano and his colleagues reported the results of their investigation, including the Company's plans to stabilize the business, take advantage of the opportunities presented by its new products, and improve performance. (JX 155).

29.     The Company had provided TCP with new projections showing that an additional advance would be sufficient to fund their operations and that, under its revised business plan, the Company expected to earn $60 million in EBITDA in 2006. ((JX 155 at 1). On this basis, Radnor requested that TCP provide an additional $23.5 million to fund what Radnor described as short term liquidity needs. (JX 155 at 8-9).

12

30.     On April 4, 2006, TCP agreed to make an additional advance (the "Tranche C Loans") in the amount of $23.5 million. (Tr. 426:12-15; 435:23-24; 435:23-436:3; 554:8-10).    The documentation for the Tranche C Loans included (a) an amendment to the Tranche A and Tranche B credit agreement; (b) an amendment to the Tranche A security agreement; and (c) two floating rate secured notes with a fixed maturity date of September 19, 2009. (JX 171, 172). In all material respects, the Tranche C loans had the same terms and conditions as the Tranche A and B Loans, except that the Tranche C Loans could be prepaid without penalty and were subject to an increase in their interest rate if not repaid within one year. (JX 176). The collateral package for the Tranche C Loans included substantially all property, plant, and equipment of the Debtors, including real estate. (Tr. 18:20-19:12).

31.     Radnor had requested that TCP make an additional equity investment in Radnor instead of making the Tranche C Loans but TCP was consistently clear that it would only make an additional debt investment.    (Tr. 416:1-417:15). From Tennenbaum's perspective an additional equity investment made no sense. It was facing the prospect of losing its October 27, 2005 Preferred Stock investment. Why would it put in more equity money? The answer is obvious.

32.     At the time of the Tranche C Loans, Radnor represented that it was solvent. (Tr. 551:17-552:24; 553:1-18; 1366:15-1367:8; JX 179). Messrs. Kennedy and Ridder provided a solvency certificate to TCP on April 4, 2006, representing that Radnor was solvent, taking into consideration both the capital infusion and debt service represented under the Tranche C Loan. (Tr. 112:20-23; 552:3-553:1; 555:23-556:22; 1366-67; JX 139). In connection with preparing the solvency certificate, Mr. Ridder

13

consulted with inside and outside counsel, Messrs. Kennedy and Hastings and PriceWaterhouseCoopers. (Tr. 1366:18-1367:2).

33.     Tennenbaum had no reason to doubt the financial information that was provided by Radnor management or the solvency certificates. (Tr. 1092:11-21). All internal memoranda from TCP when the Tranche C Loan was made show that TCP's estimate was that the Company was still solvent. (JX 133, 152, 155).

34.     The Radnor board believed that the Tranche C Loan was in the best interest of the Company and was needed to address a short-term liquidity need. (Tr. 936:16-937:12; 1182:1-21). Mr. Kennedy at all times acted in the best interests of the Company and made decisions that he believed would benefit both Radnor and its shareholders. (Tr. 527:3-17; 528:3-529:22; JX 128).

35.     Mr. Feliciano abstained from voting on the Tranche C transaction. (Tr. 185:14-18; 229:8-21; 1200:17-22; 1678:9-14; JX 165).

36.     The Debtors' creditors were not harmed by the Tranche C loan, but rather benefited from it. (Tr. 936:16; 937:12; 939:9-940:7; 1163:12-23; 1169:1-24). The proceeds from Tranche C were used partly to the benefit of Radnor's unsecured noteholders. Tranche C proceeds were also used to pay down trade debt, but were mostly used for working capital purposes, which assisted the Company's efforts to turn the corner for the benefit of, *inter alia*, unsecured creditors. (Tr. 154:6-24). The noteholders also benefited from the Tranche C loan in the money they received from their consents, described below.

37.     TCP converted $3.2 million of interest due on the Tranche A and B Loans into Tranche C loans, but never received cash from the Company. (Tr. 154:20-24).

38.     TCP never declared a default based on the failure of the Company to meet the $55 million EBITDA covenant in the Credit Agreement. The earliest date that TCP could have declared a payment default acceleration would have been August 17, 2006. (Tr. 1693:7-1694:8). TCP never declared a default based on the alleged breach of the representation of solvency.

39.     In connection with the Tranche C Loans, the TCP Lenders requested that Mr. Kennedy make a personal financial contribution to the Company to demonstrate Mr. Kennedy's commitment to returning the Company to profitability. (Tr. 430:10-24). Mr. Kennedy also (i) agreed not to receive bonus compensation for calendar 2006; (ii) made a $1 million preferred stock investment in the Company; and (iii) personally guaranteed $10 million of the Tranche C Loans. (Tr. 547:1-6; 547:24-548:6). It would be irrational to believe that Mr. Kennedy would have done this if he believed that Radnor was insolvent or was headed for a bankruptcy filing.

40.     TCP and the Radnor shareholders entered into a letter agreement dated April 4, 2006 ("Side Letter") under which the Radnor shareholders agreed that they would cause Radnor to appoint a Chief Operating Officer on or before September 30, 2006. (JX 173, Side Ltr. Pg. 2 ¶ 4; Tr. 557:14-17). TCP, at Radnor's request, gave up its right under the Side Letter to appoint a Chief Operating Officer of its choosing by agreeing in writing that the appointment of Stanford Springel satisfied the Side Letter. (Tr. 166:3-14). Mr. Springel's hiring was due in part to a demand from representatives of the Company's bank group that Radnor hire more senior executives -- not at the insistence of Mr. Feliciano or TCP. (Tr. 1190:13-1191:14). Mr. Springel is a managing director with the turnaround management firm of Alvarez and Marsal. He has 17 years

experience in the turnaround management business. (Tr. 1438:18-24).

41. The Side Letter also contains a covenant giving TCP the right to appoint a majority of Radnor's board following a payment default and subsequent acceleration of the TCP Loans. (JX 173; Tr. 558:3-24; 559:4-6). Given the trigger date of the payment default, TCP could not exercise this right earlier than August 17, 2006, and never exercised this right. (*Id.*; Tr. 459:4-9; 1691:16-1692:16; 1693:22-1694:8).

42. In 2004 Radnor issued unsecured notes in the face amount of $130 million. The unsecured noteholders had the right to stop the Tranche C loan from being made because the additional secured loans would have exceeded the maximum "indebtedness" permitted under the unsecured noteholders' Indenture. Radnor therefore solicited the consent of the noteholders to modify the Indenture. On or about April 3, 2004, 95% of the noteholders executed written consents to amend the Indenture, explicitly agreeing to an increase of secured indebtedness in the amount of $25 million. (Tr. 236:8-237:5;426:2-5; 435:23-436:3; JX 167). The price for the consent was $1,350,000. Radnor paid the first half of that fee, $675,000, upon execution of the consents. (Tr. 235:22-238:15; 533:2-541:22; 937:13-939:8; 1177:13-1178:2; Ex. 167). The consent of the unsecured noteholders is, in my view, clear evidence of the acknowledgment that the Company had serious liquidity problem and that the Tranche C secured debt transaction had the prospects of a solution to that problem. The Committee consists of seven unsecured creditors, four of whom are large holders of the unsecured notes. (Tr. 1670-71).

43. The consents that the unsecured noteholders signed acknowledged that Tranche C was a debt investment, referring to the need for additional "indebtedness."

16

(Tr. 533:2-541:22; JX 167).

44.    Article Seven of Radnor's Certificate of Incorporation provides that Radnor's directors cannot be liable for a breach of the duty of care. (JX 350).

45.    Mr. Feliciano was a valuable member of the Radnor board and consistently acted in the best interest of Radnor. (JX 127; 1173:2-9). His conduct was confirmed by all other members of the Radnor board, who testified that he was a productive and valuable member of the board who made helpful suggestions and was interested in the welfare of Radnor. (Tr. 524:1-20; 527:3-17; 573:8-21; 577:7-15; 943:2-944:21; 1171:14-1173:9; 1187:8-24).

46.    TCP appointed one board member out of a total of four, and did not control the Debtors' affairs. (Tr. 519:8-10; 576:13-577:15; 847:3-11). Neither TCP nor Mr. Feliciano ever controlled Radnor's operations. (Tr. 167:18-168:9; 171:3-173:13; 205:17-206:24; 241:2-242:11; 576:13-577:15; 602:12-604:8; 847:3-11). Mr. Kennedy, as majority shareholder and CEO, controlled Radnor at all times. (Tr. 43:13-44:20, 167:18-168:9, 171:3-173:13). TCP's board of directors seat flowed from its preferred equity investment. (Ex. 78, pg. 18 ¶ 3.1). For a minority shareholder to hold a seat on the board of directors is not uncommon. (Tr. 496:4-12' 929:14-930:23; 1171:14-1173:9). No one at TCP ever exercised control over the Radnor board of directors. (Tr. 231:4-22; 459:4-9; 558:3-559:9). The Committee makes much of the fact that the Radnor board minutes of May 17, 2006 (more than a month after the Tranche C transaction) show that in house counsel for Tennenbaum (Mr. Hollander) attended a board meeting (JX 214). On its face this suggests no impropriety by Tennenbaum or Radnor and the Committee has offered no explanation of any possible wrongdoing. Presumably, he was invited to

17

advise on the restructuring matters and it is clear that Radnor's board (controlled by insiders) was in need of all the help that it could get.

47.     There is only one financing transaction included in the Committee's complaint that occurred while Mr. Feliciano was a member of the Radnor board: the Tranche C loan. (Tr. 929). Mr. Feliciano abstained from voting on the Tranche C Loan. (Tr. 1200:8-22; JX 165).

48.     As of April 13, 2006, the Debtors were still providing guidance to their public investors that they expected to earn $45-50 million in EBITDA in 2006. (Tr. 598:10-599:2). Unfortunately, these projections proved to be wrong, and the Debtors fell short of their business plan. Within approximately three weeks of the Tranche C Loans, the banks under the Company's revolving credit facility determined that the borrowing base information provided to them had been inaccurate, and that their loans were overadvanced. (Tr. 441:18-442:10). The loss of liquidity caused by the recalculation by the banks of the borrowing base was exacerbated by continued failures by Radnor to meet its projections.

49.     During June 2006, Radnor's revolving lenders threatened to cut off funding under its working capital facility (Tr. 441:18-442:10), and did so in July 2006, which left the Company with no alternative but to file these bankruptcy cases. Thus, TCP transactions did not cause the bankruptcy cases.

50.     The Debtors requested that TCP provide a stalking horse bid on terms that would ensure the highest and best offer for the Debtors' assets. (Tr. 177:3-15; 576:2-12). The TCP Lenders were reluctant to do so, but were convinced by the Debtors that without such a bid, there would likely be a "free-fall" bankruptcy, resulting in a chapter 7 instead

18

of chapter 11 and attendant loss of value. (Tr. 1486:6-1487:4; 1736:11-14; 1738:15-1739:8). Thus, TCP reluctantly agreed to act as the stalking horse bidder, which led to negotiations on the Asset Purchase Agreement ("APA") dated August 21, 2006. (Tr. 177:3-178:17; JX 287).

51.    Mr. Feliciano had already resigned from the Radnor board when the APA was negotiated in July and August of 2006 and did not pressure Radnor's other directors to approve it. (JX 287; Tr. 176:5-8; 576:1-24; 599:1-24; 1683:7-10; JX 242). Radnor approached TCP, not the reverse. (Tr. 529:2-22; 574:1-7; 1476:4-11). Indeed, rather than Mr. Feliciano twisting the board's arm to engage in sweetheart deals with TCP, (a) TCP entered into a forbearance agreement in July 2006 for no fee when Radnor failed to make an interest payment (Tr. 1466:5-1467:14; JX 260); (b) agreed to subordinate a portion of its secured debt to the revolving lenders (also for no fee) (JX 259) and (c) the APA was only reached after what Mr. Springel, the independent COO and later independent CRO, characterized as "spirited and arms length negotiations." (Tr. 1478:4-22; 1487:2-23). The principle negotiators on behalf of Radnor were Mr. Springel, Radnor's in-house counsel (Miss Carrie Williamson) and Radnor's outside counsel (Skadden Arps Slate Meagher & Flom).

52.    The Radnor board believed that the APA was in the best interest of the Company and its constituents. (Tr. 941:22-942:15; 1515:20-1516:21). The Court previously ruled, in its bidding procedures order, that the decision to enter into the APA was "in the best interests of the Debtors, their estates, their creditors, and all other parties in interest." (Dkt. 144 at p. 2). The Court has previously ruled that the Committee has waived the right to object to the sale process. (Dkt. 144 at ¶ 1). At the bid procedure

hearing on September 22, 2006, Radnor's counsel proffered the testimony of Mr. Shapiro on behalf of Lehman Brothers and Mr. Springel as Radnor's CRO in support of the bid procedure order. The Committee did not cross examine either witness or otherwise object to their testimony. I specifically herein incorporate by reference the testimony offered by Mr. Shapiro (Doc. # 369 at pp. 43 through 45) and Mr. Springel (Doc. # 369 at pp. 47 through 52). At the conclusion of the September 22, 2006 hearing the Committee's counsel stated the Committee's "support" of the bidding procedures order. (Doc. # 369, p. 71).

53.     Radnor provided any party interested in bidding on the Debtors' assets in the bankruptcy cases with material non-public information if they agreed to sign a confidentiality agreement. (Tr. 487:6-488:11).

54.     There is no evidence showing that TCP or Mr. Feliciano ever used insider information in an inappropriate manner. Mr. Feliciano served on Radnor's Board of Directors from February 9, 2006 until June 26, 2006. There is no evidence in the record showing that during this period TCP had access to "inside" information that was relevant to a purchase of Radnor's assets that was not also available to other potential purchasers in Radnor's data room – made available to potential purchasers who signed a confidentiality agreement.

55.     On August 22, 2006, TCP filed the Declaration of Jose Feliciano, to which was attached the Credit Agreement, guaranties, security agreements, and all lien and security interest filings, evidencing Tennenbaum's claims. (Dkt. 27). On September 12, 2006, TCP filed its proof of claim in the amount of $128,835,557.26 (as of the Petition Date), to which was attached the Feliciano Declaration and all exhibits, as well as a

detailed breakdown of components of the proof claim. (Dkt. 156). The proof of claim included copies of properly recorded mortgages, fixture filings and UCC financing statements. (Dkt. 156). The Committee did not submit any evidence contradicting the validity or enforceability of the liens and security interests securing such claim. The proof of claim is secured by all collateral described therein.

56. The only evidence before the Court shows that the collateral securing the Tennenbaum claim was valued at more than $132.2 million (JX 54; 71, Annex 1), more than Tennenbaum's $128.8 million petition date claim.

57. The Committee's Complaint challenges as a preference an interest payment made on April 4, 2006. This payment is outside the 90-day preference period. Thus, the Committee asserts that Tennenbaum was an insider. I find that Tennenbaum was not an officer, director, or partner of the Debtors, nor a relative of any of them, and Tennenbaum also never held 20% of the voting securities of the Debtors. At the time of the making of the interest payment on April 4, 2006, Tennenbaum held no voting securities of the Debtors.

58. Tennenbaum was not a "person in control of the Debtor." Mr. Kennedy, not Tennenbaum, was in control of the Debtors. *See* FOF 46.

59. Tennenbaum delivered $23.5 million as an additional Tranche C advance under the Credit Agreement, of which $3.2 million was credited as a payment of interest on the pre-existing Tranche A and B debt. Therefore, the net effect was new value in excess of $20 million. Thus, the Debtors' estates were enhanced by this infusion of new value. Tennenbaum was never repaid this $20 million.

60. Both the Debtors and Tennenbaum intended that the $3.2 million interest

payment be part of a contemporaneous exchange. Two documents executed by the Debtors and Tennenbaum clearly evidence that intent. On March 15, 2006, the Debtors and Tennenbaum agreed in writing that the $3.2 million interest payment due that day would be paid in connection with the funding of the Tranche C loan several weeks later. (Tr. 554:8-15; 556:11-22; 842:4-10; 1673:17-23; JX 139; JX 171 § 1.4). The final documentation of the Tranche C loan, Amendment No. 1 to the Credit Agreement, expressly provided that net proceeds of the Tranche C loan would be used to make the interest payment on the Tranche A and B loans due on March 15, 2006. (Tr. 441:14-17; 554:8-15; JX 171 § 1.4). Thus, the parties intended that the interest payment and the new value delivered by Tennenbaum would be contemporaneous exchanges.

61.    The transfer of the interest payment by the Debtors and the delivery of new value to the Debtors, were contemporaneous. They occurred electronically at the exact same moment. On April 4, 2006, Tennenbaum actually delivered to the Debtors an amount equal to only the Tranche C loan of $23.5 million *minus* the $3.2 million interest payment which Tennenbaum credited as payment of the Tranche A & B interest payment.

62.    The Committee makes much of the "thank you" e-mail sent by Mr. Ridder to Mr. Feliciano (JX 275). This is the only evidence that the Committee presented to suggest a sub rosa arrangement between Radnor (or any employee of Radnor) and Tennenbaum leading up to the Asset Purchase Agreement.    However, Mr. Ridder explained in detail at the trial and in his prior deposition that this comment was made in the context of Mr. Feliciano's comment during a conference call that Radnor's financial group would be treated fairly in a transition.    (Tr. 1307:17-1308:17).    This does not support a conclusion that there were any improper dealings between Mr. Ridder and

22

Tennenbaum leading up to the Asset Purchase Agreement. Mr. Springel confirmed that these "assurances" were nothing more than a reference to the transition arrangement and severance payments. (Tr. 1451:18-1452:6; 1452:18-1453:3). Mr. Springel was involved in the conference call and testified that nothing improper occurred. (*Id.*; Tr. 1455:70-1456:20). As to whether there were any promises of employment, Mr. Springel emphatically said "absolutely not." (Tr. 1457:3-5).

63.     On June 14, 2006 Lehman was retained to assist Radnor in assessing various alternatives for solving the liquidity crisis. (Tr. 1470:2-1470:3). With that input, Mr. Springel concluded that a sale transaction was the most doable of the alternatives. (Tr. 1470:24-1471:3).

64.     The Committee implies an impropriety in Radnor's retention of Lehman Brothers in June 2006 because of Lehman's prior dealings with Tennenbaum. Lehman's long term relationship with Radnor made it a logical choice for Mr. Kennedy to pick as a financial advisor at the time of the financial crisis in the Spring of 2006. Furthermore, given Lehman's role in the August 2005 search for capital, and therefore its knowledge of the Company, this would seem like a logical selection by Radnor in June 2006. Mr. Feliciano understandably could have also believed that Lehman would be a logical choice for the engagement. It would follow that he saw no reason to inform Mr. Kennedy of Lehman's prior dealings with Tennenbaum on totally unrelated matters, assuming he was aware of them at the time. With respect to the late disclosure by Lehman of its prior relationship with Tennenbaum, Mr. Shapiro (Lehman's manager leading the engagement) testified that even if he had been aware of it at the time of his application for retention, he would have still sought the engagement. In my view, he rightly could have.

65.    Mr. Springel testified that the sale process was "full and fair" and no favorable treatment was given to Tennenbaum in the sale process. (Tr. 1543:4-11). The Committee focuses on the transition schedules developed by Mr. Ridder and sent to Tennenbaum but not put into the data room as evidence of an unlevel playing field. Mr. Springel testified that this transition schedule was not an important matter and that other bidders could do their own administrative cost analysis based upon data available in the data room. (Tr. 1523:19-1524:19).

## CONCLUSIONS OF LAW

### Recharacterization

1.    The Court rules against Plaintiff and in favor of Defendants on Counts I and II of the Complaint and concludes that the Tranche A, Tranche B and Tranche C Loans are true debt instruments and should not be recharacterized as equity. Taking into account the terms of the documents themselves, the facts and circumstances surrounding the making of the loans, the reasonable inferences to be drawn therefrom, as well as the economic reality of the circumstances, the Court concludes that, at the time of the transactions, the parties intended that the transactions were debt transactions and not equity.

2.    In *Cohen v. KB Mezzanine Fund II, (In re SubMicron Systems Corp.),* 432 F.3d 448 (3d. Cir. 2006), the Third Circuit explicitly rejected a "mechanistic" approach to the analysis of a recharacterization claim, under which the court weighs certain factors. Rather, the Court held that the overarching inquiry in a recharacterization case is the intent of the parties at the time of the transaction, determined not by a applying any

specific factor, but through a *common sense* evaluation of the facts and circumstances surrounding a transaction:

> [C]ourts have adopted a variety of multi-factor tests borrowed from non-bankruptcy caselaw. While these tests undoubtedly include pertinent factors, they devolve to an overarching inquiry: the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else. That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances. Answers lie in facts that confer context case-by-case.

*Id.* at 455-456.

3.    The comprehensive analysis of "intent" adopted by the Third Circuit in *SubMicron,* leads this Court to conclude that Radnor and TCP intended that the Tranche A, Tranche B and Tranche C Loans were true debt investments. Considering the facts and circumstances surrounding the TCP Loans, as well as the reasonable and logical inferences drawn therefrom, the Court finds that the Tranche A, B and C loans were intended to be and were true debt and not equity. No evidence contradicts this intent. *See* FOF 18, 31.

4.    Even were the Court to divine the parties' intent by applying the variety of factors considered by other courts in recharacterization cases, the Court's decision not to recharacterize the TCP Loans would be the same. The Court finds that the TCP Loans (a) are referred to as "debt" and/or "indebtedness" in the transaction documents; (b) were consistently referred to by all parties as "loans" and/or "indebtedness"; (c) contained a fixed maturity date of September 15, 2009; (d) gave TCP the right to enforce the payment of principal and interest; (e) contain no "voting rights"; (f) were treated as priority debt instruments, the proceeds of which were used for working capital and to replace and/or

25

pay down existing debt; and (g) are secured interests given priority in a liquidation or insolvency. *See* FOF 18, 20. *See also SubMicron*, 432 F.3d at 456 n.8.

     5.    TCP's knowledge that the Debtors were experiencing a liquidity crisis when the Tranche C Loans were made, *see* FOF 26-28, is insufficient to support recharacterization. The *SubMicron* Court expressly considered this issue and rejected recharacterization because it found that it was legitimate for an existing lender to extend additional credit to a distressed borrower as a means to protect its existing loans. *See SubMicron,* 432 F.3d at 457 ("[W]hen existing lenders make loans to a distressed company, they are trying to protect their existing loans and traditional factors that lenders consider (such as capitalization, solvency, collateral, ability to pay cash interest and debt capacity ratios) do not apply as they would when lending to a financially healthy company."); *Bayer Corp. v. Mascotech, Inc. (In re AutoStyle Plastics)*, 269 F.3d 726, 748 (6th Cir. 2001). Thus, the Court is not persuaded by the Committee's allegation in its complaint that "no prudent lender" would have made the TCP Loans.

     6.    Although not determinative of the issue of recharacterization, the Court further concludes that TCP did not exercise control over Radnor's day-to-day operations. *See* FOF 46. Mr. Feliciano's designation as a member of Radnor's four-member Board of Directors is immaterial. In *SubMicron,* the Third Circuit refused to recharacterize the debt as equity notwithstanding that the debtors' largest secured creditors held half of seats on the debtor's board. *See id.*, 432 F.3d at 457-58 (it is "not unusual for lenders to have designees on a company's board, particularly when the company [is] ... distressed."). The Court therefore holds that Mr. Feliciano's role as one of four members of the board does not weigh in favor of recharacterization.

     .

7. TCP's receipt of non-public information and *ability* to obtain more board seats is similarly immaterial. TCP never exercised its rights to obtain additional representation on the Radnor board. *See* FOF 13. The mere "right" or "ability" to control, without exercising that control, does not constitute the level control relevant to the issue of recharacterization. Mr. Feliciano's participation in board meetings, and TCP's receipt of information, were consistent with good faith efforts to provide valuable advice to the Debtors and to conduct due diligence.

8. The Court rejects the Committee's claim that TCP exercised undue "control" over Radnor due to the EBITDA covenants in ¶44 of the Credit Agreement. There is no evidence in the record to support the Committee's belief that TCP "knew" that Radnor could not and would not attain the EBITDA levels set forth in that agreement. Furthermore, the evidence does not support the Committee's claim that TCP exercised undue control over Radnor through the warrant matrix calculations based on Radnor attaining certain levels of EBITDA. The fact that TCP negotiated the acquisition of warrants for Radnor equity should the Company fail to meet certain projected EBITDA levels is unremarkable and did not constitute "control."

## Equitable Subordination

9. Although the Court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest," 11 U.S.C. § 510(c)(i), equitable subordination is "drastic" and "unusual" remedy. *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron)*, 291 B.R. 314, 327-29; *see also Waslow v. MNC Commercial Corp., (In re M. Paolella & Sons, Inc.)*, 161 B.R. 107, 117 (E.D. Pa 1993)

27

(stating that equitable subordination is an "extraordinary" departure from the "usual principles of equality of distribution and preference for secured creditors") (citations omitted).

10.    The Committee failed to meet its burden of proving that (a) TCP engaged in inequitable conduct; (b) the misconduct caused injury to Radnor's creditors or conferred an unfair advantage on TCP; and (c) equitable subordination of the claim is not inconsistent with the Bankruptcy Code. *Citicorp Venture Capital, Ltd. V. Comm. Of Creditors Holding Unsecured Claims*, 160 F.3d 982 (3d Cir. 1998); *see also SubMicron*, 432 F.3d at 462. Furthermore, the Court holds that TCP did not engage in "egregious conduct" tantamount to "fraud, overreaching or spoliation." *In re Mid-American Waste Sys., Inc.*, 284 B.R. 53, 70 (Bankr. D. Del. 2002); *Bank of N.Y. v. Epic Resorts-Palm Springs Marquis Villas, LLC (In re Epic Capital Corp.)*, 290 B.R. 514, 524 (Bankr. D. Del. 2003).

11.    TCP was not an insider for purposes of equitable subordination, as it was not a "person in control of the debtor." 11 U.S.C. § 101(31)(B)(iii).[2] Evidence that TCP monitored the Company's business and attended Board Meetings is insufficient; the Committee failed to prove that TCP exercised "day-to-day control" over Radnor's business affairs and dictated Radnor's business. *See Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.)*, 348 B.R. 234, 279 (Bankr. D. Del. 2005) ("[t]here must be day-

---

[2] The Court also holds that TCP's role does not support "insider" status under the other provisions of 11. U.S.C. § 101. *See* 11 U.S.C. § 101(31)(B) (defining "insider" as (i) a director of the debtor; (ii) an officer of the debtor; (iii) a person in control of the debtor; (iv) a partnership in which the debtor is a general partner; (v) a general partner of the debtor; or (vi) a relative of a general partner, director, officer, or person in control of the debtor.); 11 U.S.C. § 101(31)(E) (insider may include an affiliate or an insider of an affiliate of the debtor); 11 U.S.C. § 101(2) ("affiliate" includes and entity that owns, controls, or holds power to vote 20% or more of the debtor's outstanding voting securities). The fact that Mr. Feliciano was a board member does not make TCP an insider. *See Gray v. Chace (In re Boston Publ'g Co., Inc.)*, 209 B.R. 157, 169-70 (Bankr. D. Mass. 1997) (person who was both a shareholder and a creditor of a debtor and who designated a board member was not an insider).

28

to-day control, rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a direct stake.").

12.     TCP's access to performance reports and other financial information from the Company is insufficient to establish insider status. *See, e.g., Meeks v. Bank of Rison (In re Armstrong)*, 231 B.R. 746, 750 (Bankr. E.D. Ark. 1999) ("Even if the bank requires the debtor to submit frequent reports on receivables, invoices, and operations, receives all payments on the receivables, has the power to endorse checks, and obtain concessions from the debtor, the bank is not thereby an insider <u>because there is no control of the day-to-day decision making of the debtor.</u>") (emphasis added); *Gray v. Mankflow (In re Optical Techs., Inc.)*, 252 B.R. 531, 539 (M.D. Fla. 2000), *aff'd*, 246 F.3d 1332 (11th Cir. 2001) (to be determined a person in control, the person must control the company so as to dictate corporate policy and disposition of corporate assets <u>without limits</u>") (emphasis added).     Indeed, National City Bank also received non-public information from Radnor on a regular basis. *See* FOF 24.

13.     TCP did *not* engage in misconduct; TCP did *not* seek to benefit itself at the expense of others; TCP did *not* seek to mislead trade creditors, public noteholders or other stakeholders.     TCP at all times acted in good faith with a view to maximize Radnor's value to all constituents.     The testimony on these issues was consistent and credible.     Furthermore, no member of the Committee appeared at trial to offer testimony inconsistent with the foregoing conclusions.

14.     Principles of equity require a finding that the Loans should not be subordinated. The Loans advanced by TCP enhanced liquidity of the Company and, among other things, allowed the Company to continue operations. Contrary to the central

theme of the Committee's case, the preferred stock transaction and the Tranche A and Tranche B loans resulted in a reduction of the Company's net debt. *See* FOF 22. Further, the unsecured bondholders expressly consented to the Tranche C Loans. *See* FOF 42-43.

15.     Even were TCP's conduct viewed under the more stringent standards applied to insiders, the Court holds that the Committee has failed to prove that TCP engaged in wrongful conduct such as (a) fraud, illegal conduct or a breach of fiduciary duty; (b) undercapitalization; and (c) use of the Debtor as a mere instrumentality or alter ego. *In re Mid-American Waste*, 284 B.R. at 70; *See, e.g., In re Epic Capital*, 290 B.R. at 524; *In re M. Paolella & Sons*, 161 B.R. at 118.

## Breach of Fiduciary Duty Claims

### A. Claims Not Pled or Dropped After Trial.

16.     The Committee tried this case as if it were a "deepening insolvency" case. Presumably, none of the Counts of the Complaint were denominated "deepening insolvency" due to the recent rejection of such a cause of action under Delaware law. *See Trenwick Am. Litig. Trust v. Ernst & Young, LLP*, 906 A.2d 168 (Del. Ch. 2006); *see also Seitz v. Detweiler, Hershey & Assoc. (In re CitX Corp.)*, 448 F.3d 672 (3d Cir. 2006) (rejecting deepening insolvency as a theory of damages). However, simply calling a discredited deepening insolvency cause of action by some other name does not make it a claim that passes muster. As I conclude below, the *Trenwick* opinion made quite clear that under Delaware law, a board is not required to wind down operations simply because a company is insolvent, but rather may conclude to take on additional debt in the hopes of turning operations around. *See* COL 22.

17.     I further conclude that deepening insolvency fares no better as a cause of

action directly against Tennenbaum than it would against Radnor's board. As the Third Circuit discussed in *CitX*, stock investments like TCP's $25 million preferred stock investment lessen insolvency rather than increasing it. *In re CitX*, 448 F.3d at 677.

18. Moreover, the *CitX* court noted that the making of a loan similarly does not increase insolvency; it increases liabilities (the amount of the loan) and assets (the cash provided by the loan) in the same amount. *Id.* at 677 (citing Sabin Willett, *The Shallows of Deepening Insolvency*, 60 Bus. Law. 549, 552-57 (2005)). I find the Third Circuit's conclusion particularly relevant here: "Any increase in insolvency (*i.e.*, the several million dollars of debt incurred after the . . . investment) was wrought by *CitX*'s management, not by Detweiller." *In re CitX*, 448 F.3d at 677. No matter how the Committee titles its causes of action, the holding of *CitX* defeats the claim.

19. I also note that the Committee dropped after trial all of its causes of action for the breach of the duty of care. Undoubtedly, it did so because Article Seventh of Radnor's Certificate of Incorporation (JX 350) exculpates Radnor's directors from liability for breach of the duty of care, a permissible provision pursuant to 8 DEL. CODE ANN. § 102(b)(7). Section 102(b)(7) provisions act as a complete bar to liability even when creditors or a trustee, rather than stockholders, are suing derivatively. *Production Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 793 (Del. Ch. 2004); *Pereira v. Farace*, 413 F.3d 330, 342 (2d Cir. 2005), *cert. denied*, 2006 U.S. LEXIS 3965.

20. However, the fact that the Committee has dropped its duty of care claims does not render Article Seventh and § 102(b)(7) meaningless to this case. To the contrary, much of the Committee's case at trial at best would have implicated the duty of care, not the duty of loyalty. By way of example only, if the Radnor board should not

31

have approved a $55 million EBITDA maintenance covenant because that number was too high (and the Court need not and does not make such a finding here), it did not do so in bad faith; rather, the only potential breach would have been in not understanding that the Company's projections were optimistic and that the maintenance covenant, set at the $55 million level, ran too high of a risk of causing a default. That is a quintessential duty of care claim. Simply alleging that Mr. Kennedy desired funding at any cost does not convert this claim into one implicating the duty of loyalty. Thus, Article Seventh and § 102(b)(7) would have barred any such claims against the board, and Tennenbaum and Mr. Feliciano therefore could not have possibly been held liable for aiding and abetting such claims.

**B.    Aiding and Abetting Claim.**

21.    TCP never aided and abetted a breach of fiduciary duty. The elements for aiding and abetting a breach of fiduciary duty under Delaware law are as follows: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) a knowing participation in the breach by the non-fiduciary defendant." *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 584 (Del. Ch. 1998). The evidence does not support a finding that any of these elements have been satisfied.

22.    Even if the Debtors were insolvent at the time of the Tranche A, B and C transactions, the Radnor Board's actions would not have breached any fiduciary duties owed to the Debtors' unsecured creditors. As the Court of Chancery acknowledged in *Trenwick*, Delaware law does not impose an absolute obligation on the board of an insolvent company to cease operations and liquidate. *See Trenwick*, 906 A.2d at 204. Rather, directors of an insolvent company may pursue strategies to maximize the value of

the company, including continuing to operate in the hope of turning things around. *See id.*; *Equity-Linked Investors, L.P. v. Adams*, 705 A.2d 1040 (Del. Ch. 1997) (permitting board of company within days of a bankruptcy filing to incur new secured debt in aid of funding risky but promising new products over the objection of preferred stockholders with liquidation preference). Specifically, the Court in *Trenwick* stated as follows:

> If the board of an insolvent corporation, acting with due diligence and good faith, pursues a business strategy that it believes will increase the corporation's value, <u>but that also involves the incurrence of additional debt</u>, it does not become a guarantor of that strategy's success. That the strategy results in continued insolvency and an even more insolvent entity does not in itself give rise to a cause of action. Rather, in such a scenario the directors are protected by the business judgment rule. To conclude otherwise would fundamentally transform Delaware law.

*Trenwick*, 906 A.2d at 205 (emphasis supplied). Thus, "the business judgment rule protects the directors of solvent, barely solvent, and insolvent corporations, and that the creditors of an insolvent firm have no greater right to challenge a disinterested, good faith business decision than the stockholders of a solvent firm." *Id.* at 195 n.75.

23. The Court holds that the Radnor Board did not act disloyally in entering into the transactions with Tennenbaum. *See* FOF 4, 17, 34, 52. Given the company's prospects with its new products, the advice of competent financial advisors and the consideration of the board, I find no basis in the record for the Committee's repeated assertion that Mr. Kennedy was "swinging for the fences" just to protect his equity investment, rather than acting in the best interests of the company and its stakeholders. Indeed, the Court notes that Mr. Darr's concession that had the company liquidated in October 2005, even without considering transaction costs, such liquidation would have ensured a substantial loss for unsecured creditors (Tr. 670-71), provides a good faith basis for the Radnor board to have continued with its business plan rather than shutting

down prematurely.

24.     The Radnor Board's good faith decisions to enter into the subject transactions with Tennenbaum to aid Radnor in carrying out its business plan are afforded the protection of the business judgment rule.   Radnor's business judgment against liquidation and in favor of attempting to continue operations and continue with its business plan of expansion was not inherently wrongful.   *See Official Comm. of Bond Holders of Metricom, Inc. v. Derrickson*, No. C 02-04756 JF, 2004 WL 2151336, at \*5 (N.D. Cal. Feb. 25, 2004) (even in the zone of insolvency, it is not a breach of fiduciary duty under Delaware law to carry out the company's business plan).[3]

25.     The Court also rejects the Committee's argument that TCP aided and abetted the board's breach of fiduciary duty of accepting TCP's stalking horse bid.   That argument is precluded by the law of the case, since the Bidding Procedures Order already approved the stalking horse bid as in the best interests of the estates.   FOF 52; *see also E. Pilots Merger Cmte. v. Cont'l Airlines, Inc. (In re Continental Airlines, Inc.)*, 279 F.3d 226, 232 (3d Cir. 2002), *cert. denied*, 537 U.S. 944 (2002) (law of the case doctrine "limits relitigation of an issue once it has been decided.").

26.     Additionally, the Committee has failed to demonstrate "knowing participation" on the part of Tennenbaum in any breach.   Tennenbaum was a participant in the complained-of transactions, but that fact alone does not subject it to liability for aiding and abetting breaches of fiduciary duties.   *See HMG/Courtland Properties, Inc. v. Gray*, 749 A.2d 94, 121 (Del. Ch. 1999) (aiding and abetting claim must be supported by

---

[3] In this respect, the Court notes that it is strikingly odd to have a trial on aiding and abetting breach of fiduciary duties where the alleged primary wrongdoers (the board) are not named as defendants.   The Court is not aware of a single reported post-trial or appellate decision awarding or upholding damages for aiding and abetting breach of fiduciary duty where the primary wrongdoers were not named as defendants.

proof of an understanding between the parties "with respect to their complicity in any scheme to defraud or in any breach of fiduciary duties"). Rather, a plaintiff must prove that the defendant knowingly participated not just in the transactions but in the breach of fiduciary duties. *See id.*; *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001) (to satisfy the "knowing participation" element, a plaintiff must establish that the defendant acted "with the knowledge that the conduct advocated or assisted constitutes such a breach [of fiduciary duty].") Tennenbaum reasonably relied on the Debtors' officers' representation that the Debtors were solvent at the time that the transactions at issue were entered into. *See* FOF 15, 32, 33. Given this representation, Tennenbaum would have had no reason to know that fiduciary duties were even owed to creditors, much less that they were breached.

## C.   Claims Against Mr. Feliciano For Breach of Duty of Loyalty.

27.    The Court holds that Mr. Feliciano did not breach his duty of loyalty. The Committee has failed to prove that Mr. Feliciano was interested in any transaction and voted in favor of it due to his outside financial interests rather than voting in the best interests of Radnor. *Cede & Co. v. Technicolor Inc.*, 634 A.2d 345, 363 (Del. 1993) ("to establish a breach of duty of loyalty, [plaintiff] must present evidence that the director either was on both sides of the transaction or 'derive[d] any personal financial benefit from it in the sense of *self-dealing*, as opposed to a benefit which devolves upon the corporation or all stockholders generally.'") (emphasis in original).

28.    Indeed, the Committee only complains of two transactions that occurred after Mr. Feliciano became a director. In connection with the first, the Tranche C Loan, the record evidence is that Mr. Feliciano *abstained* from the vote. *See* FOF 35, 47. The

35

second is the stalking horse bid. The record reflects that Mr. Feliciano resigned from the board in June 2006, *see* FOF 51, and that Radnor first approached Tennenbaum about making a stalking horse bid in July. (Tr. 1476). Simply put, Mr. Feliciano did not vote on either transaction, much less vote in his self interest. Nor does the record support that Mr. Feliciano used his board seat to pressure the other directors into the Tranche C and stalking horse deals. *See* FOF 51.

29.     To the extent the Committee relies on Tennenbaum's prior relationship with Lehman Brothers, or Mr. Feliciano's failure to disclose the prior relationship to the board, as support for this claim, the Court concludes that the prior relationship did not present an actual conflict. Nor is there evidence to support that the prior relationship had any influence on Lehman's conduct, provided an advantage to Tennenbaum, or resulted in any damage to any constituency. Both Mr. Feliciano's and Lehman's Mr. Shapiro's testimony about this issue – in particular the extent and tenuous nature of the prior relationship – is consistent with the Court's conclusion.

30.     I likewise find no merit in the separate allegation that Mr. Feliciano breached his duties by using his knowledge to bid on the assets of Radnor in this bankruptcy case. As a matter of law, there is no *per se* breach of fiduciary duty for an insider making a bid to purchase a company or its assets. Were it otherwise, every management led leveraged buyout would be a *per se* breach of fiduciary duty, yet the Delaware courts have held otherwise. *See, e.g., In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531 (Del. Ch. 2003); *Lewis v. Leaseway Trans. Co.*, Civ. Act. No. 8720, 1990 Del. Ch. LEXIS 69 (Del. Ch. May 16, 1990). Moreover, as noted above, it is the law of the case that it was in the Debtors' interest to enter into the stalking horse bid. COL 25.

36

Therefore, there can be no breach of duty by Mr. Feliciano in using information about Radnor in formulating that bid, since that bid helped Radnor.

### Disallowance of Proof of Claim

31.    The proof of claim filed by Tennenbaum established the *prima facie* validity of the Tennenbaum claim in the amount of $128,835,557.26 as of the petition date, plus post petition accruals and expenses referred to therein. *See* Fed. R. Bankruptcy Procedure 3001(f) ("a proof of claim executed and filed in accordance with these rules shall constitute *prima facie* evidence of the validity and amount of the claim"). *See also In re International Wireless Communs. Holdings, Inc.*, 257 B.R. 739 (Bankr. D. Del. 2001) ("Initially, a claimant must allege facts sufficient to support a legal basis for the claim. If the assertions in the filed claim meet this standard of sufficiency, the claim is prima facie valid pursuant to Bankruptcy Rule 3001(f)."). Thus, Tennebaum has met its burden of proof, and its proof of claim is allowed until an objection supported by substantial evidence is presented to the Court. *See In re Mid-American Waste*, 284 B.R. at 65 (party objecting to properly filed proof of claim bears the initial burden of presenting sufficient *evidence* to overcome the presumed validity and amount of claim); *Brown v. IRS (In re Brown), 82 F.3d 801 (8th Cir. 1996)* (a claim's presumptive validity is not altered unless an objection is supported by *substantial evidence*). The Committee has offered the Court no evidence, let alone substantial evidence, contesting any component of Tennenbaum's claims. Accordingly, Tennenbaum's proof of claim is allowed, as of the Petition Date, in the amount of $128,835,557.26, plus the amount of all post petition interest and expenses that constitute obligations under the TCP Credit Agreement.

32. The Court's Bid Procedures Order (Dkt. 144) provided that Tennenbaum would be allowed to credit bid its allowed claim to the full extent allowed by Bankruptcy Code Section 363(k). Accordingly, Tennenbaum is authorized to credit bid the full amount of its claim, in an amount equal to $128,835,557.26, plus the amount of all post petition interest and expenses that constitute obligations under the TCP Credit Agreement.

## Avoidance of Liens

33. The proof of claim filed by Tennenbaum in the amount of $128,835,557.26 as of the petition date included copies of properly recorded mortgages, fixture filings and UCC financing statements. *See* FOF 55. The Committee submitted no evidence contradicting the validity or enforceability of the liens and security interests securing such claim. Once a secured creditor shows its properly filed financing statements, it has established a *prima facie* secured claim; and a secured creditor is not required to show that its security interests are not voidable in order to establish its secured status. *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991), *cert. denied*, 503 U.S. 937 (1992).

34. Thus, I hold that Tennenbaum met its initial burden of proof with respect to its liens and security interests, and because the Committee submitted no substantial evidence contradicting such liens and security interests, Tennenbaum need present no further proof of the validity and enforceability of its liens and security interests.

## Preference Claim

35. Under Bankruptcy Code Section 547(b)(5), the burden of proof is on the Committee to show that Tennenbaum was under-secured. *Batlan v. Transamerica*

*Commer. Fin. Corp. (In re Smith's Home Furnishings, Inc.)*, 265 F.3d 959, 963-64 (9th Cir. 2001) (stating that transfers to fully-secured creditors are generally not preferential because fully-secured creditors are entitled to recover 100 percent of their claims in a liquidation); *Lease-A-Fleet v. Wolk (In re Lease-a-Fleet, Inc.)*, 151 B.R. 341, 348 (Bankr. E.D. Pa. 1993) (plaintiff in a preference action must prove defendant is unsecured or undersecured); *O'Neill v. Dell (In re O'Neill)*, 204 B.R. 881, 892 (Bankr. E.D. Pa. 1997) (same). Section 547(b)(5) is not a defense to a preference; rather it is a fundamental component of the case-in-chief of a preference claim, and, under Section 547(g), the burden of proof on every element of Section 547(b) is on the Committee. *Mellon Bank, N.A.*, 945 F.2d at 642; *Golden v. The Guardian (In re Lenox Healthcare, Inc.)*, 343 B.R. 96, 107 (Bankr. D. Del. 2006) (trustee must establish each element of section 547(b), including section 547(b)(5)); *IT Litigation Trust v. Alpha Analytical Labs (In re IT Group, Inc.)*, 331 B.R. 597, 601 (Bankr. D. Del. 2005) (creditor's committee, as plaintiff, had burden of proving each of the elements under 547(b)).

36.    The Committee offered no evidence at all on the issue of the value of the collateral securing Tennenbaum's claim. The Court finds that the only competent evidence admitted at trial shows that the collateral securing the Tennenbaum claim was valued at more than $132 million: millions of dollars more than Tennenbaum's $128.8 million petition date claim. FOF 56. Therefore, the Committee has failed to meet its burden of proof.

37.    Additionally, the Court concludes that the interest payment at issue was made on April 4, 2006, outside the 90-day preference period. Therefore, the payment is a preference only if Tennenbaum was not insider for the purpose of the one-year

reachback period of Section 547(b)(4)(B). However, I already have concluded that Tennenbaum was not an insider. *See* COL 11.

38.     Whatever influence Tennenbaum exerted on the direction of the Debtors was indirect, arising from the covenants and other provisions Tennenbaum contracted for in the Credit Agreement, which is not sufficient to turn a secured lender into an insider of the Debtors.  Reasonable financial controls negotiated at arms' length between a lender and a borrower does not transform a lender into an insider. *See In re Winstar Commc'n., Inc.,* 348 B.R. at 279 (there must be *day-to-day control,* rather than some monitoring or exertion of influence regarding financial transactions in which the creditor has a direct stake); *In re Octagon Roofing,* 124 B.R. 522, 530 (Bankr. N.D. Ill. 1991) (exercise of financial control by a creditor over a debtor which is incident to the creditor-debtor relationship, does not make the creditor an insider); *In re Huizar,* 71 B.R. 826, 832 (Bankr. W.D. Tex. 1987) (creditor-lending institutions must be able to exercise a reasonable amount of debtor control without fear of being labeled an insider).  Similarly, the mere opportunity to exercise control, if not exercised, also does not make a creditor a person in control of a debtor. *In re Wescorp, Inc.,* 148 B.R. 161 (Bankr. D. Conn. 1992); *In re Tech. for Energy Corp.,* 56 B.R. 307, 316 (Bankr. E.D. Tenn. 1985) (defendant held not to be an insider where it attained control of Debtors' voting stock but did not exercise such power); *In re Piece Goods Shop, Co., L.P.,* 188 B.R. 778 (Bankr. M.D.N.C. 1995) (because right to elect directors was never exercised, defendant held not to be an insider).

39.     The Court also finds that the interest payment cannot be avoided for an additional reason:  it was made in connection with a contemporaneous exchange with Tennenbaum, in which Tennenbaum provided more than $20 million of net new value to

the Debtors, and the parties clearly intended such interest payment and new value to be a contemporaneous exchange. *See* FOF 59. Under Bankruptcy Code Section 547(c)(1), a transfer is not a preference if it was "(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange."

40.    A creditor provides new value when it makes a loan to the debtor. *Laker v. Vallette (In re Toyota of Jefferson, Inc.)*, 14 F.3d 1088, 1091 (5th Cir. 1994). Tennenbaum's delivery of more than net $20 million to the Debtors on April 4, 2006 as an additional advance under the Credit Agreement is new value for the purposes of Section 547(c)(1). Even if some of the new value is used by a debtor to pay pre-existing debt, the transfer falls within the four corners of 11 U.S.C. §  547(c)(1) if the amount transferred to the debtor exceeds the amount repaid on pre-existing debt. *In re Arrow Air, Inc.*, 940 F.2d 1463, 1466 (11th Cir. 1991); *In re Erin Food Servs., Inc.*, 117 B.R. 21, 30-31 (Bankr. D. Mass. 1990).

### Acquiescence

41.    The Committee's equitable subordination and breach of fiduciary duty Counts are causes of action sounding in equity. In addition to holding that the Committee has failed to prove its case-in-chief on these Counts, I conclude that the Committee's claims are barred by the equitable defense of acquiescence, as applied by the Delaware courts.

42.    It has long been the law of Delaware that where a transaction cannot be accomplished without stockholder approval, a stockholder who either votes in favor of the transaction or accepts the consideration offered by the transaction is barred from

asserting claims in claims in connection with that transaction. *See, e.g., Kahn v. Household Acquisition Corp.,* 591 A.2d 166, 176-77 (Del. 1991); *Bershad v. Curtiss-Wright Corp.,* 535 A.2d 840, 848 (Del. 1987); *Elster v. Am. Airlines,* 100 A.2d 219, 220-221 (Del. Ch. 1953); *Finch v. Warrior Cement Corp.,* 141 A. 54, 60 (Del. Ch. 1928). Here, 95% of the noteholders, including *a majority of the members of the Committee,* did both: they voted in favor of Tranche C and accepted $675,000 in exchange for their consent. Thus, they have acquiesced to the Tranche C Loans. Having acquiesced to it, they cannot now be heard to argue that Tranche C should be treated as equity, nor that entering into Tranche C was a breach of fiduciary duty.

43.    While the Committee is a separate legal entity from the notcholders who approved Tranche C, the Delaware cases draw no such distinction. They typically arise in a class action context, where like the seven members of the Committee, a stockholder attempts to bring claims not only on his or her own behalf, but on behalf of <u>all</u> stockholders, including stockholders that did not acquiesce. Nevertheless, the Delaware courts have barred the stockholders who acquiesced from asserting such claims on behalf of those who did not. *See, e.g., Kahn,* 591 A.2d at 176-77; *In re Lukens Inc. S'holders Litig.,* 757 A.2d 720, 738 (Del. Ch. 1999), *aff'd sub. nom.,* Walker v. Lukens, Inc., 757 A.2d 1278 (Del. 2000) (TABLE) (noting, because a "large majority of the putative plaintiff class...both voted in favor of the merger and received the benefits of it," that "plaintiffs would confront substantial obstacles in continuing the action on behalf of those persons"). I find that the noteholders who control the Committee are in the same position and cannot maintain their equitable subordination and breach of fiduciary duty claims.

42

## Damages

44.    Even if I were to hold that the Committee had prevailed on one or more of
its claims for breach of fiduciary duty, I would hold that it has failed to prove a
recognizable measure and amount of damages. First, while Mr. Darr denied it, his
damages calculation essentially is a deepening insolvency model, as it calculates the
difference between the value that the unsecured creditors would have received if the
Debtors filed for bankruptcy in October 2005 and the value available to them in this
bankruptcy case.[4]    (Tr. 692-93).    The Third Circuit recently held that deepening
insolvency is not a recognized form of damages. *In re CitX Corp.*, 448 F.3d at 677-78;
*cf.* COL 16-18.  Because I find Mr. Darr's methodology to be indistinguishable from
deepening insolvency and I find deepening insolvency to be an impermissible measure of
damages, I find no basis in the record from which to compute damages.

45.    Moreover, Mr. Darr's damages calculation is overstated.  First, more than
half of his computed damages assume that the Committee *loses* its subordination and
recharacterization arguments. (Tr. 694-96).  Second, he readily conceded that he did not
subtract transaction costs from his analysis, but it is indisputable that to realize any value
at October 27, 2005, Radnor would have had to file for bankruptcy or undertake an
extraordinary corporate transaction, both of which are expensive. (Tr. 706-08).  Third,
Mr. Darr's damages model incorrectly assumes that Radnor's value as of October 27,
2005 would not have been further reduced by Radnor's poor operating performance even

---

[4] Mr. Darr's attempts to distinguish his model from deepening insolvency were unavailing. The fact that
his model does *not* assume that the Defendants committed any wrong, Tr. 692-94, makes me less likely to
apply the damages formulation, as that is a concession that there is no causation between the harm and the
damages alleged. *See, e.g., Gannett Co., Inc. v. Kanaga, M.D.,* 750 A.2d 1174, 1188 (Del. 2000) ("Once
liability is established, a plaintiff seeking recovery of damages in a tort action must establish causation and
consequential damage."). Mr. Darr's other attempt to distinguish deepening insolvency, on the ground that
he does not include new *unsecured* debt, Tr. 692-93, simply is irrelevant, since he is showing deterioration
in value *above* the unsecured creditor level.

if it had been restructured in a bankruptcy on that date, an illogical assumption given the Company's financial performance after October 27.

46.     Finally, I note that Mr. Darr opined that he had no opinion as to who caused the damages or any inequitable conduct engaged in connection therewith (Tr. 694:4-9) and the theories offered by the Committee are rejected as discussed above.

Dated: Nov. 17, 2006
Wilmington, Delaware

HONORABLE PETER J. WALSH,
UNITED STATES BANKRUPTCY JUDGE